# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| TANNER WYATT GRAHAM, | * |
| Plaintiff, | * |
|  | * |
| v. | * |
|  | * Civil No. 24-1514-BAH |
| VOLVO GROUP NORTH AMERICA MOHA, | * |
| Defendant. | * |
|  | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Tanner Wyatt Graham ("Plaintiff" or "Graham") brought suit under the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't ("SG") § 20-606 et seq., against Volvo Group North America, LLC[1] ("Defendant" or "Volvo") alleging that he was subject to a hostile work environment due to his religion and disability. ECF 1-2. Pending before the Court is Volvo's motion for summary judgment. ECF 27. Graham filed an opposition, ECF 30, and Volvo filed a reply, ECF 31. All filings include memoranda of law and exhibits.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Volvo's motion is **GRANTED**.

---

[1] The Clerk will be instructed to amend the docket to reflect the correct name of the corporate entity sued here. *See* ECF 27-1, at 3 n.1 ("The Complaint in this case names an entity that does not exist. As Defendant has asserted since the removal of this case to federal court (ECF No. 1), the correct Defendant is Volvo Group North America, LLC.").

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    Graham's Employment at Volvo Begins

Relevant to this litigation, Graham has Asperger's syndrome, a form of autism. ECF 27-4, at 14, 64:7–11. Graham's Asperger's "affects [his] motor skills, but it does not majorly impact [his] ability to work." *Id.* at 14, 64:17–20. However, Graham reports that his Asperger's "greatly affects" his "social life," including his "ability to speak," to "have eye contact," his "mannerisms," and how he carries himself. *Id.* at 16, 77:1–4. Graham notes that he takes "precautions to ensure" others feel "comfortable" with him. *Id.* at 16, 77:5–7. For example, if his disability led to a misunderstanding with another person, Graham states that he would apologize and explain that he sometimes misunderstands things due to his disability. *See id.* at 16, 77:15–20. Also relevant to this litigation, Graham is a devout Christian. *See id.* at 25, 88:3–5.

Volvo is a vehicle manufacturer that operates a manufacturing facility in Hagerstown, Maryland, where it assembles engines, transmissions, and axles for commercial trucks. *See* ECF 27-3 (declaration of Cara Thompson), at 2 ¶¶ 1–2. Graham's MFEPA claims arise out of his employment at Volvo's Hagerstown facility, where Graham worked as an industrial worker. *Id.* ¶ 3. Graham was offered and accepted employment with Volvo in December of 2021. *Id.* at 7–8 (offer letter), at 14 (record of e-signature). In connection with his job offer, Graham was asked to complete a form identifying whether he had any disability. ECF 27-4, at 13, 59:1–10; ECF 27-3, at 10 (voluntary self-identification of disability form). As mentioned, Graham has Asperger's syndrome. ECF 27-4, at 14, 64:7–11. However, Graham did not disclose to Volvo that he had a disability on the form provided, and instead checked the box "I Don't Wish To Answer." ECF 27-3, at 2 ¶ 3, at 10; ECF 27-4, at 13, 59:1–10. Graham asserts that he did not report his Asperger's

2

because he "was afraid [he] would be denied employment by Volvo or treated differently." ECF 27-4, at 14, 64:3–6.

Graham began working at the Hagerstown facility on January 18, 2022. ECF 27-3, at 3 ¶ 5. During his first week, Graham attended orientation with the other new employees hired at the same time. *Id.* As a part of that orientation process, Plaintiff was issued a copy of Volvo's Transitional Worker Policy Handbook, which contained copies of Volvo's policies regarding Harassment and Workplace Violence, and a copy of the Volvo Group Code of Conduct. *Id.* ¶¶ 5–6. On January 22, 2022, at the end of orientation, Graham completed an acknowledgment that he had read and understood the policies that had been provided to him by Volvo. *Id.* at 3 ¶ 7, at 85 (employee acknowledgement), at 93 (e-signature record for Volvo policies and directives).

During Graham's employment at Volvo, Graham would bring his personal Bible to work to read during his breaks. ECF 27-4, at 23–24, 86:11–87:8. Graham also openly spoke and acknowledged his religion to his coworkers. *See* ECF 30-3, at 47, 197:4–6. Graham stated that he "wouldn't preach or go out of [his] way to talk about religion to people," but Graham "would refer to it and if someone was talking about their personal life story," he would sometimes invoke a story from the Bible. ECF 27-4, at 23, 86:15–20. However, according to Graham, he did not intend to "push" religion onto his coworkers and "would respect them" if they expressed they were uncomfortable with the topic. *Id.* at 24, 87:11–16.

### 2. Volvo's Employment Policies

#### i. *Harassment Policy*

Volvo maintains a harassment policy that prohibits the "harassment of any employee . . . by any individual because of" the employee's "religion" or "disability," among several other legally protected characteristics. ECF 27-3, at 28. The policy defines several forms of harassment, including verbal, non-verbal, physical, and sexual. *See id.* at 28–29. Employees are instructed

3

under the policy to report incidents of harassment. *See id.* at 30. In italicized, bold letters, the policy states that employees "who have experienced conduct they believe is contrary to this policy have an obligation to take advantage of this complaint procedure. An employee's failure to satisfy this obligation could affect his or her legal rights in pursuing subsequent legal action." *Id.* Specifically, "[a]ny employee . . . who feels he/she has been harassed should immediately report such incident to his/her Human Resources Business Partner at the facility at which they are employed or to another senior manager/executive within the Company." *Id.* "Complaints may be made in writing or in person," but in either case the employee "must be able to provide the name of the alleged offender(s); the date, location, and nature of the alleged violation, and the identify of any witnesses to the alleged violation." *Id.* The policy also notes that any complaint filed "will be treated as highly private and confidential." *Id.*

### ii.    Workplace Violence Policy

Volvo also has a workplace violence policy, which prohibits employees from making threats of violence or otherwise engaging in threatening behavior. *See* ECF 27-3, at 21–23. This policy states, in relevant part, that Volvo "will not tolerate any act or threatened act of violence of harm to an employee or business associate whether initiated by another employee, a customer, vendor, or other individual who presents himself on the Company's property." *Id.* at 21. The policy also provides that "employees are expected to report," either in writing or in person, "to their supervisor or other management representative any act or behavior, whether from an employee or other individual, that they believe to be suspicious or threatening." *Id.* at 21–22. Like the harassment policy, the workplace violence policy requires the employee to "provide the name of the alleged offender(s); the date, place and nature of the alleged violation; and the identity of any witnesses to the violation." *Id.* at 22. Employees found in violation of the policy are "subject

4

to discipline up to and including discharge." *Id.* The policy also outlines the course which investigations of alleged harassment should take. *See id.* at 31.

### iii.    Code of Conduct

Volvo's code of conduct also contains language prohibiting discrimination and harassment in the workplace. *See* ECF 27-3, at 55. The code prohibits "verbal or physical harassment, bullying, sexual harassment, power harassment, racism, inappropriate humor, or other actions that offend or cause distress." *Id.* at 59. "Harassment" is defined, for the purposes of the code, as "any conduct or comments that create, encourage, or permit an offensive or intimidating work environment." *Id.* The code of conduct further details ways employees can report conduct that violates the code. *See id.* at 74. Employees are instructed to report any concerns to their manager or to a "relevant functional group" such as Human Resources. *Id.*

### 3.    Graham's Employment on Third Shift

Graham was hired to work on third shift.[3] ECF 27-4, at 9, 44:17; ECF 27-3, at 3 ¶ 8. However, Graham worked on first shift during his training period for approximately one month, during which Graham was supervised by David Weissenberger, a production manager at Volvo. ECF 27-4, at 6, 37:9–13; ECF 27-6, at 4, 14:19–23. In his first month, Graham trained under Jason Murray,[4] an employee on first shift who performed the same job. ECF 27-4, at 9, 44:1–3, 44:12–20; ECF 27-6, at 6, 19:6–24.

---

[3] Graham explained at his deposition that the difference between first, second, and third shift is the "hours in which the shifts take place." ECF 30-3, at 8:7–10.

[4] Weissenberger explained at his deposition that "[t]rainers aren't individually assigned to an employee. They typically are assigned to a station that they are an expert in. And then if an employee needs to be trained in that station, that trainer will train them." ECF 27-6, at 6, 34:17–22; *see also* ECF 30-3, at 57, 207:14–21 (Graham's description of "trainers" at Volvo).

5

On January 28, 2022, Murray reported to Weissenberger that Graham was telling Murray stories about having a "pornography addiction" and a "chronic masturbation problem." ECF 27-6, at 6, 19:6–24, at 7, 20:5–7. After Weissenberger's conversation with Murray, Weissenberger "thought that it would be a good teaching moment for [Graham] if" he and Weissenberger "sat down and talked about work-appropriate behavior." *Id.* at 6, 19:6–10. The same day, Weissenberger spoke with Graham and sent an email to Cara Thompson, a Human Resources Business Partner at Volvo's Hagerstown facility, ECF 27-3, at 2 ¶ 1, for "documentation purposes in case anything else happened in the future," ECF 27-6, at 8, 25:15–21, at 11, 44:1–5; *see also id.* at 14 (email purportedly detailing meeting between Weissenberger and Graham from Weissenberger to Thompson).

However, Graham denies that Weissenberger spoke to Graham about any wrongdoing on Graham's part. *See* ECF 27-4, at 12, 49:1–12. Rather, Graham asserted that Weissenberger told Graham during the meeting "that he heard several coworkers saying sexually explicit things about" Graham, and Graham informed Weissenberger that his "trainer was saying sexual things about [him] to several . . . coworkers." *Id.* at 12, 49:15–19. Graham acknowledged that Murray, his "trainer," likely did not know about his religion at that point in time, but Graham alleged that Murray likely "could see [Graham] reading [his] Bible on [Graham's] breaks." *Id.* at 31, 94:12–19, 94:15–18. According to Graham, Weissenberger "said he would talk to [Graham's] trainer about why he was saying these things about" Graham. *Id.* at 12, 49:19–21; *see also* ECF 30-3, at 60, 210:2–11 ("He told me because I was the victim, he would not report it to HR and he would talk to my coworker about why he's saying these things . . . .").

Around this time period, Graham worked with Debbie Singleton, Tara Shafer, and Tanya Henline, all of whom were also assembly line workers. ECF 27-4, at 7–8, 42:21–43:12, at 34,

97:11–21. Graham stated that during that time, his Asperger's resulted in him misunderstanding a conversation between coworkers. *See* ECF 27-4, at 17–18, 78:4–79:19. Specifically, Plaintiff overheard Henline tell Singleton that her father had passed away while in rehab. *Id.* at 17, 78:6–8. When Graham expressed his condolences to Henline and noted that he was glad her father was now free from his addictions, Henline became upset and stated that her father was in physical rehab, not drug rehab. *Id.* at 17, 78:10–15. Graham says that he apologized and told Henline and Singleton that he misunderstood what she had meant by "rehab" on account of his disability. *Id.* at 17, 78:15–16, at 18, 79:5–8; *see also id.* at 24, 97:11–18 (noting that Graham "told Debbie, Tanya, Tara" about his Asperger's). Henline reacted negatively, according to Graham, "yelling out loud that [Graham] was mocking her dead father" and telling other coworkers what had happened, which apparently culminated in Henline slamming "her hand down on the table" and making threats towards him before leaving the area. *Id.* at 17, 78:17–18, at 18, 79:1–5, 79:9–19.

After the incident, Graham stated that his coworkers would "talk down to [him] and judge [him] because of [his] mistakes." ECF 30-3, at 32, 100:11–14. Graham noted that Henline "continuously insisted that [Graham] needed to do better," meaning Graham needed to improve his work performance, despite Graham's explanation that he was doing the best he could on account of his disability. ECF 27-4, at 37, 102:1–6. Graham also suggested that Henline's "tone" suggested to him that she was treating him differently on account of his disability. *See* ECF 30-3, at 33, 101:12–19.

On February 13, 2022, Graham completed his training and moved to third shift. ECF 30-4, at 5, 16:1–4. Weissenberger stated that he did not have any problems or observe any performance issues with Graham while Graham was working on third shift, *id.* at 10, 39:4–10, and Weissenberger observed that Graham fit in more on third shift than he did on first shift, *id.* at 10,

7

39:15–17. Weissenberger noted that he sometimes observed Graham openly reading his bible at work during third shift. *Id.* at 10, 39:1–3.

### 4.    Graham's Employment on Second Shift

In May of 2022, Graham agreed to transfer to second shift effective June 6, 2022. ECF 27-4, at 9, 44:4–11; ECF 27-3, at 3 ¶ 8. On second shift, Graham reported to Joel Gray, a production manager. ECF 27-4, at 6, 37:9–13. Graham asserts that, "[a]t first, [he] had great interactions with Joel Gray." *Id.* at 19, 80:6–10. On second shift, Graham was trained by Will Haines. ECF 27-4, at 8, 43:18–19; ECF 30-5, at 5–6, 17:19–18:20 (Haines describing training Graham). Graham stated that he told Haines on his first day on second shift that he had autism. ECF 27-4, at 34, 97:11–15; ECF 30-3, at 52, 202:15–18. Haines stated Graham may have brought up that Graham had autism but could not remember an "exact date or time" the information was communicated, although Haines stated it occurred to him Graham might have autism during training. ECF 30-5, at 7, 21:3–8, at 8, 22:10–16. Haines also stated that he eventually became aware that Graham was religiously devout and observed Graham reading his Bible at work. *Id.* at 10, 27:1–7, 27:16–18. Graham worked often with another assembly line worker, Kendall Davis, on second shift, who would provide Graham with parts to put on engines. ECF 27-4, at 8, 43:15–19; ECF 30-5, at 29, 80:1–8 (Haines observing that Graham "had taken to talk with [Davis] fairly often" and that she was "working the substation that fed parts to [Graham]'s station"). Graham testified that he never had any issues with Davis, although he did not always feel "heard" by Davis when he told her about the "bullying" he was experiencing. ECF 27-4, at 20, 83:9–19. Graham was also friends with Sam Mazzone on second shift, who Graham reports was very kind and respectful to him. *Id.* at 20–21, 83:20–84:7.

However, Graham experienced tension with certain coworkers, most notably Javaughn Barthley. *See id.* at 11, 48:12–21. Graham stated that when he first met Barthley after moving to

8

second shift, Barthley referred to him as the "Bible boy" and said "we heard that you take your Bible into the bathroom and masturbate and then cry about it and then pray and read scriptures." *Id.* at 15, 70:10–17. To Graham's knowledge, Barthley and his friends only referred to Graham as "Bible boy" one time. *Id.* at 28, 91:8–10; ECF 30-3, at 5, 13:12–14. However, Haines stated that the rumor about Graham masturbating while at work was widespread and discussed by individuals on several shifts. ECF 30-5, at 20–23, 71:8–74:3. Following their initial introduction, Graham described the behavior of Barthley and his friends on second shift as follows:

> They ostracized me and when I would sit down at the lunchroom table on second shift, they would all get up. I would talk to them, they would ignore me. They wouldn't even look at me. They'd act as if I didn't exist. They would often tease me. I would see water bottles and nuts and bolts fly towards my station and bounce off my equipment and nearly hit me. I would see [Javaughn] and the blonde boy throw things over my head back and forth to each other when I was in between their stations.

ECF 27-4, at 27–28, 90:2–91:1; *see also id.* at 41, 108:6–11. According to Graham, Barthley also tried to "pickpocket" items out of Graham's fanny pack. ECF 27-4, at 29, 92:14–17; ECF 30-3, at 54, 204:10–13. Haines observed that Graham "seemed to have trouble with almost everybody that he talked to in terms of being accepted and people really wanting to be social with him." ECF 30-5, at 15, 36:13–16.

Graham believed Barthley and others treated him this way because Graham was openly Christian. ECF 27-4, at 30, 93:8–9. Graham stated at his deposition that Barthley and his friends would ask Graham "difficult questions" about Graham's religion, such as "why would God allow suffering?" ECF 30-3, at 48, 198:9–11. Graham believed they asked him these questions "as a way of mocking" Graham. *Id.* at 48, 198:14–16. Graham also stated that he felt coworkers "profiled" Graham "as weird and creepy due to [his] awkward mannerisms and speech tones." ECF 27-4, at 28, 103:11–16.

Gray stated that on occasion, Gray would pull Graham "aside to talk about his quality defects and his station." ECF 27-7, at 5, 25:21–25. Although Gray stated that he had at least "one conversation that [Gray] indulged [Graham] and his concern about making friends," Gray recalled that "[t]he rest of the conversations [Gray] had with [Graham] were just about quality and production and performance rating." *Id.* at 4, 24:10–13; *see also* ECF 30-5, at 26, 77:21–24 (Haines recalling that Gray usually talked to Graham about "performance and how to improve performance"). According to Gray, Graham "would blame" the "negative feedback" he was receiving related to his performance on his "inability to make friends and to get along with people," and Gray noted that it was his job "as a manager to make sure the conversation stays on track." ECF 27-7, at 4, 24:16–21.

At some point, Gray provided some counseling to Graham about Graham's socialization concerns. ECF 27-4, at 10, 47:1–13, 47:17–19. According to Graham, Gray "recommended that [he] need[ed] to fit in and that [Graham] should not discuss [his] Bible as people aren't religious nowadays." *Id.* at 10, 47:13–15 (alterations added); *see also id.* at 10, 48:3–6. According to Gray, Gray told Graham that he observed Graham bringing up "religious topics a lot during conversations and that sometimes people are not comfortable with that topic of conversation." ECF 27-7, at 5, 25:1–7. During the meeting with Gray, Graham apparently attempted to discuss the way certain coworkers were treating him and that he "was feeling depressed." ECF 27-4, at 39, 106:11–15. Graham recalled that Gray "cut [him] off and said that [he] should go to see Volvo's onsite therapist for [his] depression." *Id.* at 39, 106:13–18. Graham did not go into further detail with Gray about the conduct he was experiencing from Barthley and others. *Id.* at 39–40, 106:17–107:4.

10

Around the same time, Graham "noticed Joel [Gray] started treating [Graham] differently" too. ECF 27-4, at 19, 80:11–13; ECF 30-3, at 18, 81:6–11 (stating that "[i]t was like a complete personality shift"). Gray apparently no longer smiled or looked in Graham's direction, and avoided making small talk with Graham. *See* ECF 27-4, at 19, 80:13–17. Graham also observed Gray be "really close to [Barthley] and the other boys." ECF 30-3, at 18, 81:14–20.

Graham admits that he never reported what he was experiencing to Volvo's Human Resources Department. ECF 27-4, at 44–46, 157:19–159:3. However, Graham stated that he "asked several of [his] coworkers what to do about the mistreatment," including asking Haines "on multiple occasions." ECF 27-4, at 40, 107:12–16; *see also id.* at 45, 158:6–14 (when asked why Graham did not contact Human Resources, he responded "[a]nytime I had an issue with my coworkers, I would ask them what to do . . . and they would never refer me to anyone or give me advice."). Graham stated that several coworkers told Graham "to ignore it." ECF 27-4, at 40–41, 107:20–108:2. According to Graham, Haines told Graham to "see therapists" or "change [his] topic" when speaking to Barthley and others. *Id.* at 40, 107:16–20. Haines stated that Graham never told Haines he had been called "Bible boy" by Barthley. ECF 30-5, at 18, 65:10–13. Haines also stated that he believed Graham was aware that he could talk to his supervisor or to Human Resources about the issues he was experiencing. *Id.* at 23, 74:4–20.

### 5.    Graham's Termination from Volvo

In June of 2022, an employee of a nearby machine shop in Hagerstown shot and killed three coworkers and injured two other individuals. ECF 27-5, at 16–18, 172:15–174:7. In the wake of that incident, Thompson stated that there was a sense of urgency around workplace violence issues at the Hagerstown facility. *Id.* at 18, 174:11–13.

11

On July 18, 2022, Davis told Haines that Graham had made some disturbing comments to her that Davis could not decide whether to act on.[5] ECF 27-8, at 5–6, 80:10–81:18.  Haines recommended to Davis that they immediately report the comments to Gray. ECF 27-8, at 6, 81:19–22, at 7, 91:10–24. After talking with Davis and Haines, Gray requested they provide written statements regarding the comments. ECF 27-7, at 6–7, 50:25–51:3, at 7, 51:23–25, at 8, 54:3–7; ECF 27-5, at 5, 41:15–17, at 11, 60:14–15, at 27 (Davis' written statement).  Gray then met with Thompson, Steve Fagert, Graham's "Area Manager," and Chawn Rosenberry, Graham's union representative, to notify them of the situation. ECF 27-7, at 8–9, 54:6–55:10; ECF 27-5, at 4, 11:20–22, at 5, 41:3–13; ECF 30-7, at 4, 60:8–15. During the meeting Gray apparently told the group that Graham had issues with socializing, which had involved bringing up religion to coworkers. *See* ECF 30-7, at 15–17, 78:19–80:22. Also during the meeting, Rosenberry apparently stated that Graham had made Rosenberry feel "uncomfortable." ECF 30-7, at 18–19, 81:17–82:8. The individuals in attendance at the meeting contacted Volvo's Corporate Security Department for additional advice. ECF 27-5, at 20–21; ECF 30-7, at 4, 60:16–19, at 6, 62:3–10.

The Washington County Sheriff's Office was called to escort Graham off company property based on the statements he made. ECF 27-5, at 21; ECF 30-7, at 7, 63:16–21; ECF 30-8 (transcript of call), at 2–10. During the call to the Sheriff's Office, Fagert, when asked if Graham was known to be violent, responded that he did not know but that there had "been situations where [Graham had] gotten into disagreements with coworkers" and could be "agitated easily." ECF 30-8, at 5, 4:16–21. Fagert also told the operator that Graham "makes reference to very religious related topics." *Id.* at 6, 5:14–15. Graham was subsequently suspended pending Volvo's

---

[5] At his deposition, Graham denied making such statements. ECF 30-3, at 45, 139:1–17. The Court need not reproduce them here, as Graham denies making them and they are not relevant to the Court's analysis of his hostile work environment claims.

12

investigation into Davis and Haines' report.  ECF 27-4, at 42, 119:13–21.  As part of the investigation, Thompson interviewed other employees who had heard inappropriate comments made by Graham.  *See* ECF 30-7, at 14, 72:15–18.  Thompson noted that during her discussions with employees as a part of the investigation, some mentioned that Graham had autism.  *Id.* at 14, 72:12–21.  Based upon the findings from Thompson's investigation, Volvo terminated Graham for violations of Volvo's workplace violence and harassment policies.  ECF 27-5, at 12, 134:19–21.  On July 22, 2022, Thompson, Gray, and Rosenberry contacted Graham by telephone and notified him of the decision to terminate his employment.  ECF 27-4, at 43, 124:3–7; ECF 27-5, at 13, 135:18–22.

Thompson stated at her deposition that the grounds for termination of Graham was "conduct violation number 18," or violation of the "harassment policy and workplace violence," and that Graham was told his "inappropriate comments" had resulted in his termination.  ECF 27-5, at 12–13, 134:19–135:10 (noting that "social incidents" was not the reason provided to Graham for termination).  Graham stated that he was told on the call that his termination resulted "due to a few social incidences."  ECF 27-4, at 43, 124:13–17.  After being informed of that decision, Graham stated that his conduct resulted from Asperger's syndrome.  ECF 27-4, at 43, 124:19–21; ECF 27-5, at 14, 136:10–13.  Before the events related to Graham's alleged threatening comments, he never disclosed his Asperger's to Human Resources.  *See* ECF 27-4, at 24–25, 87:20–88:2.

**B.    Procedural History**

On March 28, 2024, Graham filed this action in the Circuit Court for Washington County, alleging that he was subject to a hostile work environment during his employment at Volvo on account of his religion (Count I) and his disability (Count II) in violation of MFEPA.  *See* ECF 1-2; ECF 2.  Graham's complaint does not allege that he was wrongfully terminated from Volvo or raise any claims related to his termination.  On May 24, 2024, Volvo removed the action to this

Court under 28 U.S.C. § 1332(a). *See* ECF 1, at 1–3. On June 11, 2024, Volvo filed its answer to Graham's complaint, ECF 8, and on June 13, 2024 the Court issued a scheduling order commencing discovery, ECF 9. The parties completed discovery on March 3, 2025, *see* ECF 21, and on April 25, 2025, Volvo filed a motion for summary judgment, ECF 27. That motion is now ripe for resolution.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per

14

curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States,* 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III. ANALYSIS

Volvo advances three major arguments in support of its motion for summary judgment. *See* ECF 27, at 1–2. First, Volvo argues that as "a threshold matter, Plaintiff cannot establish that the alleged harassing conduct was severe or pervasive as required" for a hostile work environment claim. *Id.* at 1 ¶ 2. Second, Volvo contends that Graham "cannot establish a connection between the alleged harassment and his religion or disability." *Id.* ¶ 3. Finally, Volvo argues that Graham "cannot establish that the liability for any alleged harassment is imputable to Volvo since he never reported that harassment as required under company policy." *Id.* at 2 ¶ 4. The Court addresses Volvo's arguments but begins with an overview of the applicable state law, MFEPA. In particular, the Court considers which iteration of MFEPA applies to Graham's claims.

15

## A.    MFEPA

MFEPA has stood as an important statutory protection for employee civil rights in Maryland since its enactment in 1965. *See Peninsula Reg'l Med. Ctr. v. Adkins*, 137 A.3d 211, 214 (Md. 2016). "Because the MFEPA is 'modeled on federal anti-discrimination legislation,' Maryland courts largely apply federal precedent to employment discrimination claims brought under the MFEPA." *Watrous v. AIRtec, Inc.*, Civ. No. TJS-24-2076, 2025 WL 2494324, at *10 (D. Md. Aug. 28, 2025) (quoting *Doe v. Catholic Relief Servs.*, 484 Md. 640, 656 (2023)). "However, where the MFEPA materially departs from the language of Title VII, the MFEPA is not read in lockstep with the federal statute." *Id.* (quoting *Doe*, 484 Md. at 657–58). Because MFEPA has so closely mirrored Title VII, there have been "relatively few appellate decisions interpreting" MFEPA. *See Adkins*, 137 A.3d at 217.

Relevant to the claims asserted here, MFEPA prohibits an employer from engaging in harassment of an employee. *See* SG §§ 20-601(h), 20-606(a)(5). While MFEPA's harassment provision "originally mirrored the language in Title VII, in October 2022, [it] was amended to clarify that harassment need not be severe or pervasive in all circumstances to be actionable." *Watrous*, 2025 WL 2494324, at *10. Before amendment, MFEPA defined "harassment" as including "harassment based on race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability,[6] and retain[ing] its judicially determined meaning, except to the extent it is expressly or impliedly changed in this subtitle." SG § 20-601(h) (effective Oct. 1, 2019 through Sept. 30, 2022). Now MFEPA defines "harassment" as:

(1) unwelcome and offensive conduct, *which need not be severe or pervasive*, when

---

[6] MFEPA defines "disability" as, in relevant part, "a mental impairment or deficiency" or "being regarded as having a physical or mental impairment as otherwise defined under this subsection." SG § 20-601(b)(1)(i), (iii). The parties do not dispute that Graham's Asperger's syndrome would fall under this definition. *See* ECF 27-1, at 5 n.4; ECF 30, at 25.

(i) the conduct is based on race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, disability, or military status; and

(ii)    1. submission to the conduct is made either explicitly or implicitly a term or condition of employment of an individual;

2. submission to or rejection of the conduct is used as a basis for employment decisions affecting the individual; or

3. based on the totality of the circumstances, the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile; and

(2) sexual harassment.

SG § 2-601(h) (emphasis added). "Therefore, to bring a harassment or hostile work environment claim under the MFEPA" today, "it is sufficient to prove that the conduct creates an objectively abusive or hostile work environment." *Watrous*, 2025 WL 2494324, at \*10. However, the "elements of a harassment or hostile work environment claim under the MFEPA are otherwise the same as those under Title VII." *Id.* MFEPA's new definition of harassment became effective on October 1, 2022. Act of May 29, 2022, § 2, 2022 Md. Laws, ch. 657 ("That this Act shall take effect October 1, 2022.").

### 1.    Retroactivity

Graham's employment at Volvo ended on July 22, 2022, several months before the effective date of the MFEPA amendment. *See* ECF 27-5, at 13, 135:18–22. There is a general presumption under Maryland law that a statute is intended to have purely prospective effect. *Est. of Zimmerman v. Blatter*, 183 A.3d 223, 241 (Md. 2018) (citing *Langston v. Riffe*, 754 A.2d 389, 394 (Md. 2000)). In the absence of legislative intent to the contrary,[7] a statute is not given

---

[7] "A retroactive statute is one which purports to determine the legal significance of acts or events that have occurred prior to the statute's effective date." *State Comm'n on Hum. Rels. v. Amecom Div. of Litton Sys., Inc.*, 360 A.2d 1, 3 (Md. 1976).

retroactive effect. *Id.* That presumption necessarily applies to amendments to statutes, which are themselves acts of law. *See Johnson v. Mayor & City Council of Baltimore*, 40 A.3d 475, 490 (Md. App. 2012) ("The default presumption is that an amendment is forward-looking."), *aff'd*, 61 A.3d 33 (Md. 2013).

"Thus a statute, though applied only in legal proceedings subsequent to its effective date and in that sense, at least, [is] prospective, is, when applied so as to determine the legal significance of acts or events that occurred prior to its effective date, applied retroactively." *State Comm'n on Hum. Rels. v. Amecom Div. of Litton Sys., Inc.*, 360 A.2d 1, 3–4 (Md. 1976). Accordingly, a Maryland statutory amendment will, in the ordinary case, apply only to *conduct* that occurred on or after its effective date. *See id.* However, there are some exceptions to this rule. Namely, "a statute governing procedure or remedy" will have retroactive effect "when the statute becomes effective." *Est. of Zimmerman*, 183 A.3d at 241 (quoting *Pautsch v. Md. Real Estate Comm'n*, 31 A.3d 489, 509 (Md. 2011)); *see also Hanke v. United Parcel Serv., Inc.*, No. 1:23-CV-02130-JRR, 2024 WL 3554973, at *5 (D. Md. July 26, 2024) ("There are two exceptions to the presumption that a statute applies prospectively: (1) statutes that effect a change in 'procedure only, and not in substantive rights,' and (2) 'statutes that have remedial effect and do not impair vested rights.'" (cleaned up)).

Volvo argues that because the conduct Graham challenges occurred prior to October 1, 2022, Graham's hostile work environment claims "are subject to analysis under the standards applicable to a Title VII hostile work environment harassment claim." ECF 27-1, at 15. Graham, however, counters that the amendment to MFEPA's definition of harassment was a procedural amendment and thus should have retroactive application to Graham's MFEPA claims. *See* ECF 30, at 9 ("Senate Bill 450 Applies Retroactively as a Procedural Amendment.").

18

The Supreme Court of Maryland has explained "that 'a law is substantive if it creates rights, duties and obligations,' and procedural if it 'simply prescribes the methods of enforcement of those rights.'" *State v. Smith*, 117 A.3d 1093, 1104 (Md. 2015) (quoting *Langston v. Riffe*, 754 A.2d 389, 401 (Md. 2000)). Procedural amendments are intended "only to alter the procedural machinery involved in the enforcement of those rights, or the remedies available to enforce them." *Langston*, 754 A.2d at 401. For example, an amendment to a Maryland law which extended the time for filing a certificate in a medical negligence suit was "clearly procedural in nature" and held to apply retroactively. *See Roth v. Dimensions Health Corp.*, 632 A.2d 1170, 1175 (Md. 1993). Conversely, the Supreme Court of Maryland held that a law, which authorized an injunction ordering reinstatement of an employee in discrimination actions brought subsequent to the termination of the employee's employment, was substantive where "the right of [an] employer . . . to terminate an employee in accordance with the terms of his contract" was affected by the law's enactment. *State Comm'n on Hum. Rels.*, 360 A.2d at 3–5.

Senate Bill 450's amendment to MFEPA's definition of harassment falls squarely in the substantive camp. As Volvo points out, "Senate Bill 450's amendment to the MFEPA fundamentally alters the legal standard for actionable harassment." ECF 31, at 3. Graham effectively acknowledges that point too, writing: "the Maryland legislature intentionally expanded the definition of 'harassment' to encompass a broader scope of behavior as amounting to an actionable hostile work environment." ECF 30, at 14; *see also* Md. Gen. Assembly Fiscal Note, 2022 Sess. S.B. 450 ("The bill explicitly . . . expands the definition of harassment to include conduct under certain circumstances, as specified, which need not be severe or pervasive."). That is not a mere alteration of "the procedural machinery involved in the enforcement" of an employee's right under MFEPA—it is an alteration to the very scope of the right itself. *See*

*Langston*, 754 A.2d at 401. If the Court were to accept Graham's suggestion that "Senate Bill 450 merely provides a new procedure for evaluating unlawful conduct under MFEPA," ECF 30, at 12, the Court would struggle to envision an amendment which could ever escape the category of "procedural."

Nevertheless, Graham argues that the Court should find a contrary expression of legislative intent to the presumption of prospective application in the Maryland General Assembly's silence. *See* ECF 30, at 10–11 ("[W]hat is more telling of the General Assembly's intent in the creation of Senate Bill 450 is not the absence of language indicating that the amendment should apply retroactively, but instead the absence of language indicating that it should be applied prospectively only." (emphasis in original)). Graham urges the Court to view Senate Bill 450's enactment in contrast to the language used to originally enact the definition of harassment in MFEPA, House Bill 679. *See* ECF 30, at 10–11. As Graham points out, prior to 2019, § 20-601(h) of MFEPA did not exist.[8] House Bill 679 explicitly stated that "this Act shall be construed to apply only prospectively and may not be applied or interpreted to have any effect on or application to any cause of action arising before the effective date of this Act." 2019 Md. Laws Ch. 222 § 3 (H.B. 679). Because such language is absent from Senate Bill 450, Graham invites the Court to conclude that the General Assembly's silence implies its intent to give the amendment retroactive application. *See* ECF 30, at 11.

The Court rejects Graham's invitation primarily because to do so would effectively turn on its head the presumption of prospective application applied to substantive Maryland laws. "There is, of course, no absolute prohibition against retroactive application of a statute. If the Legislature

---

[8] *Compare* SG § 20-601 (effective Oct. 1, 2019 through Sept. 30, 2022), *with* SG § 20-601 (effective Oct. 1, 2015 through Sept. 30, 2019).

intends that a law affecting rights or matters of substance operate retrospectively, that intent will be given effect so long as constitutional prohibitions are not violated." *State Comm'n on Hum. Rels.*, 360 A.2d at 4. But such intent must be expressed through words that "are *so clear, strong and imperative* in their retrospective expression that no other meaning can be attached to them," or the act itself must reveal that "the *manifest* intention of the Legislature could not otherwise be gratified" than through retroactive application. *Janda v. Gen. Motors Corp.*, 205 A.2d 228, 232 (Md. 1964) (emphasis added) (quoting *State Tax Comm'n v. Potomac Elec. Power Co.*, 32 A.2d 382 (Md. 1943)); *see also Hanke*, 2024 WL 3554973, at *5 ("There is no language in the statute based on which the court may infer that the Maryland General Assembly intended retroactive application of the amendment."). Finding no expression of legislative intent for retroactive application of the amendment, either in text or in manifest purpose, the Court applies the strong presumption of prospective application to the 2022 amendment to MFEPA's definition of harassment. Accordingly, MFEPA's pre-October 2022 definition of harassment will be applied to Graham's claims here,[9] which accrued prior to the amendment's effective date.

### 2. Applicable Law

"Courts apply Title VII precedent, including the burden-shifting framework, to discrimination, retaliation, and harassment claims brought under the MFEPA[.]" *Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196, 211 (D. Md. 2025) Accordingly, the Court will look to the standards for a Title VII hostile work environment claim to assess Graham's hostile work environment claims arising under MFEPA. *See Hammoud v. Jimmy's Seafood, Inc.*, Civ. No. MJM-21-1593, 2024 WL 2749696, at *9 (D. Md. May 29, 2024) ("[T]he Court will generally

---

[9] Consequently, the Court takes no position on the proper interpretation of MFEPA's post-October 2022 definition of harassment, which, as noted by Graham, expressly departs from the "severe or pervasive" standard. *See* SG § 20-601(h)(1).

21

apply the standards for a Title VII hostile work environment claim to the merits of Plaintiff's workplace harassment claim under the MFEPA."); *Spiller-Holtzman v. Univ. of Md., Balt.*, 805 F. Supp. 3d 602, 620 (D. Md. 2025) (applying Title VII "severe or pervasive" standard to a hostile work environment claim arising under MFEPA).

To prevail on his hostile work environment claims, Graham "must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's [religion or disability]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (alteration added) (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)). Volvo argues that it is entitled to summary judgment because Graham has failed to adduce evidence in discovery establishing the second, third and fourth elements of his claims. *See* ECF 27-1, at 15 ("For purposes of this Motion, Volvo does not dispute that Plaintiff experienced some degree of unwelcome conduct. However, Volvo is entitled to summary judgment because Plaintiff cannot establish the other three required elements of his hostile work environment claims."). The Court addresses the third element of Graham's claim below. Because the Court concludes that Volvo is entitled to summary judgment on that basis, it need not analyze the other elements of Graham's claim.[10]

---

[10] However, the Court observes that there are serious questions as to whether some of the unwelcome conduct Graham experienced during his employment at Volvo was based on his religion or disability. *Cf. Noveras v. Bon Secours Hosp.*, Civ. No. HAR-94-3319, 1995 WL 656900, at *5 (D. Md. Oct. 27, 1995) (assuming for the sake of argument that plaintiff could prove harassment was based on upon national origin but noting that "other incidents, while unpleasant," did not appear to be motivated by that protected characteristic), *aff'd*, 81 F.3d 150 (4th Cir. 1996). While there is little doubt that Graham experienced unwanted and unpleasant conduct, that it was motivated by his disability status and faith is not clear from the record.

## B.    Severe or Pervasive

"A hostile-work-environment claim will only succeed when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022) (quoting *Boyer-Liberto*, 786 F.3d at 277). "Unlike a typical claim of intentional discrimination based on a discrete act, a hostile-work-environment claim's 'very nature involves repeated conduct.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). However, "[t]he behavior need not be *both* severe and pervasive: the more severe the conduct, the less pervasive the plaintiff need prove that it is." *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 413 (D. Md. 2015) (*Reed v. Airtran Airways*, 531 F. Supp. 2d 660, 669 (D. Md. 2008)) (emphasis in *Reed*).

"The severe or pervasive conduct which gives rise to an abusive work environment must be both objectively and subjectively 'hostile' and 'abusive.'"[11] *McIver*, 42 F.4th at 407 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)); *see also Waters v. Mayor & City Council of Balt.*, Civ. No. ADC-23-1178, 2025 WL 327822, at *9 (D. Md. Jan. 28, 2025) ("In order to satisfy the 'severe or pervasive' element, a plaintiff must demonstrate that they 'subjectively perceive[d] the environment to be abusive' and 'that a reasonable person would find [the environment] hostile or abusive[.]'" (quoting *Harris*, 510 U.S. at 21–22)). "[P]laintiffs must clear a high bar in order to satisfy the [objective] severe or pervasive test."[12] *Perkins v. Int'l Paper Co.*,

---

[11] "However, the plaintiff need not establish a psychological injury. 'Title VII comes into play before the harassing conduct leads to a nervous breakdown.'" *McIver*, 42 F.4th at 407 (quoting *Harris*, 510 U.S. at 22).

[12] To satisfy the subjective element of the "severe or pervasive" standard, a plaintiff must show that he "subjectively perceive[d] the environment to be abusive." *Govan v. Caterpillar, Inc.*, 899 F. Supp. 2d 445, 452 (D.S.C. 2012) (quoting *Harris*, 510 U.S. at 21–22). Although the parties' arguments, and this Court's analysis, focus on the objective prong of the standard, the Court

23

936 F.3d 196, 208 (4th Cir. 2019) (alteration in *Perkins*) (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)).

"Objective analysis of whether a workplace is hostile and abusive looks to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *McIver*, 42 F.4th at 407 (quoting *Boyer-Liberto*, 786 F.3d at 277). "Even conduct that would objectively cause hurt feelings or offense is not enough to be severe or pervasive." *Id.* at 408 (citing *Sunbelt Rentals, Inc.*, 521 F.3d at 315); *see also Perkins*, 936 F.3d at 208 ("[I]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." (citation

---

observes that the record is light on evidence establishing Graham's subjective perception of his working environment as abusive or hostile. Although the law "comes into play before the harassing conduct leads to a nervous breakdown," "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment," and the severe or pervasive standard is not met. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Beyond Graham's statement at his deposition that he "felt" his coworkers were "distant" and "judged' him, *see* ECF 30-3, at 35, 103:11–16, there is little direct evidence of how Graham subjectively perceived the alleged hostile conduct or how it affected his ability to work during the relevant time period. *Cf. White v. Fed. Exp. Corp.*, 939 F.2d 157, 161 (4th Cir. 1991) ("Our review of the record reveals no evidence which establishes that the alleged racially hostile environment had any effect on John White."). There is also a lack of evidence reflecting that Graham went to significant lengths to put a stop to the conduct, which could be probative of his perception of the environment at the time. *Cf. Peterson v. Cap. One, N.A.*, 705 F. Supp. 3d 484, 500 (D. Md. 2023) ("It cannot be disputed that Plaintiff found the alleged harassment to be subjectively severe or pervasive, given the extensive efforts she expended to try to remedy it, from contacting Human Resources repeatedly, to notifying the Human Rights Commission of Montgomery County, and even filing this lawsuit."); *Taylor v. Republic Servs., Inc.*, 968 F. Supp. 2d 768, 793 (E.D. Va. 2013) (concluding that plaintiff "failed to demonstrate that she subjectively perceived her work environment to be hostile or abusive" where she "did not report many of these instances for over one year, and in two of the cases did not identify the perpetrators by name or provide sufficient detail to initiate an investigation"). However, in considering the effect of the conduct alleged on Graham, the Court is also cognizant that Graham's Asperger's syndrome may mean it took him longer to process some of the conduct to which he was subject. *See* ECF 30-3, at 11, 65:10–13 ("I'm unable to understand or portray facial expressions, body language, sarcasm, subtle things, mannerisms.").

24

omitted)). "[R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." *Perkins*, 936 F.3d at 208 (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315–16) (alterations in *Sunbelt Rentals, Inc.*). Rather, the "ultimate inquiry is whether the conduct is so 'extreme' that it 'amount[s] to a change in the terms and conditions of employment.'" *McIver*, 42 F.4th at 408 (alteration in *McIver*) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Statements to coworkers that a plaintiff "did not know about do not create a genuine issue of material fact." *Perkins*, 936 F.3d at 210. The "experiences of third parties about which a plaintiff was unaware should not be considered in evaluating a hostile work environment's severe or pervasive requirement." *Id.* However, while the Fourth Circuit has "held that the primary focus in the hostile work environment analysis is on the plaintiff's experience, evidence of how others were treated in the same workplace can be relevant to a hostile work environment claim." *Id.* (citing *Sunbelt Rentals, Inc.*, 521 F.3d at 317). "[T]he fact that an employee does not witness statements made to third parties does not bar their consideration"—the environment an employee experiences can, "in addition to his own treatment, include information he obtains about similar treatment of others even if he did not witness that treatment." *Id.* at 210.

The question before the Court is thus whether the evidence Graham has adduced during discovery, "taken together," creates a genuine dispute of material fact that the conduct he experienced was objectively "severe or pervasive enough to rise to the level of a hostile work environment." *See McIver*, 42 F.4th at 408. To answer this question, the Court turns to the

evidence offered by Graham in support of his MFEPA hostile work environment claims based on his religion and disability.[13]

### 1.    Religion

The Court first reviews the evidence Graham invokes to support his hostile work environment claim based on his religion. Graham asserts that the trouble began in January of 2022, when Graham's trainer, Murray, allegedly began "saying sexual things about [him] to several . . . coworkers." ECF 27-4, at 12, 49:15–19. Graham admits that he did not discuss his religion with Murray. *See id.* at 21, 94:10–19. Nevertheless, Graham suggests that Murray was aware of his religion because he saw Graham reading Graham's Bible on breaks. *Id.* at 31, 94:12–19. Even assuming that Murray's alleged comments about Graham were based on Murray's knowledge of Graham's faith, there is no evidence to suggest that these comments, or any rumors springing therefrom, continued to impact Graham's working conditions on first and third shift after Graham spoke with Weissenberger about them. *See* ECF 27-6, at 5–6, 18:19–19:10. Rather, Graham stated that he was moved to a different part of the line after he spoke to Weissenberger, "quite a distance from any other employee. So it was like a fresh new start for [him]." ECF 30-3, at 66:2–9. Throughout the rest of the few months Graham worked on third shift, he describes no instances of unwelcome conduct related to his religion, and certainly none that were "so 'extreme' [they] 'amount[ed] to a change in the terms and conditions of employment.'" *McIver*, 42 F.4th at 408 (alterations added) (citation omitted). To the contrary, Weissenberger observed that Graham

---

[13] Graham advances arguments under both the "severe or pervasive" standard for harassment and MFEPA's post-October 2022 definition of harassment. *See* ECF 30, at 15–16. The Court considers Graham's arguments under the former standard, in light of its holding that the post-October 2022 definition of harassment of MFEPA does not apply to Graham's claims. *See supra* Section III.A.

had few performance issues while working on third shift and that Graham fit in more on third shift than he had on first. *See* ECF 30-4, at 5, 16:1–4, at 10, 39:4–17.

The next example of unwelcome conduct Graham points to, and perhaps the most severe instance of poor conduct that he alleges, occurred months later, in June of 2022, after Graham moved to second shift. *See* ECF 27-4, at 15, 70:10–17. However, this conduct and what followed was relatively short in duration as it stretched only from Graham's first meeting with Barthley, until approximately one month later when Graham was terminated in July of 2022. ECF 27-4, at 30–31, 93:17–94:8; *cf. Kiver v. Fed. Bus. Couns., Inc.*, Civ. No. 23-3398-BAH, 2024 WL 3424059, at *12 (D. Md. July 16, 2024) ("The conduct complained of occurred largely over one month, between late June and July of 2022, which is relatively infrequent given that Plaintiff worked at FBC for nearly a year."); *Singleton v. Dep't of Corr. Educ.*, 115 F. App'x 119, 122 (4th Cir. 2004) (finding six months of flirtation and inappropriate comments were not objectively severe or pervasive). During their initial encounter, Barthley apparently referred to Graham as "Bible boy" and suggested that he and some of his coworkers "heard that you take your Bible into the bathroom and masturbate and then cry about it and then pray and read scriptures." ECF 27-4, at 15, 70:10–17. Although Barthley's comment was unquestionably troubling to Graham, "courts across the country have made clear that name-calling, on its own, rarely gives rise to objectively 'severe or pervasive' harassment." *Reeves v. Dimensions Health Corp.*, Civ. No. 21-1674-BAH, 2024 WL 3234006, at *6 (D. Md. June 28, 2024); *see also Murphy v. BeavEx, Inc.*, 544 F. Supp. 2d 139, 150–51 (D. Conn. 2008) (finding that name calling and teasing based on disability were not sufficient to show "severe or pervasive" harassment). Importantly, Graham does not indicate that this name-calling was frequent—to the contrary, he states that it happened only once. ECF 27-4,

27

at 5, 13:12–14 (when asked how many times Barthley called Graham "Bible boy," he responded, "Once directly to me.").

Beyond that instance, Graham's allegations of unwelcome conduct involved mostly general descriptions of rude or dismissive behavior from his coworkers, without express reference to, or disparagement of, Graham's religion. *See, e.g.*, ECF 27-4, at 27–28, 90:2–91:1 ("They ostracized me and when I would sit down at the lunchroom table on second shift, they would all get up. I would talk to them, they would ignore me."). Graham does not provide details about the frequency or duration of these interactions with his coworkers. *See Coleman v. McCarthy*, Civ. No. SAG-17-1164, 2021 WL 165130, at *7 (D. Md. Jan. 15, 2021) (holding that failure to "allege the dates or frequency of [ ] comments, or any particular concentration over a limited time frame," was insufficient to meet the severe or pervasive standard), *aff'd sub nom. Coleman v. Whitley*, No. 21-1181, 2022 WL 16630570 (4th Cir. Nov. 2, 2022); *cf. Harkum v. Jacobs Tech., Inc.*, Civ. No. GLR-22-479, 2023 WL 2163178, at *11 (D. Md. Feb. 22, 2023) ("Harkum does not indicate how frequently these employees called him by that nickname or provide names or dates related to that alleged conduct.").

Even assuming that these interactions happened at a high frequency over the course of Graham's short term of service on second shift, general allegations of consistent "condescending and abusive language and behavior," "[w]ithout details about the nature of the remarks and behavior at issue," make it "impossible for the Court to determine whether the behavior [Graham] complains of would be seen as objectively hostile by a 'reasonable person.'" *Dangerfield v. Johns Hopkins Bayview Med. Ctr., Inc.*, Civ. No. JKB-19-155, 2019 WL 6130947, at *3 (D. Md. Nov. 19, 2019) (quoting *Harris*, 510 U.S. at 21). To the extent that Graham has provided some details about the type of conduct he was subject to, Graham states that he felt harassed by Barthley and

28

others' questions at the lunch table, the throwing of items near Graham's station, and Barthley's alleged attempt to pickpocket Graham's fanny pack. *See* ECF 27-4, at 27–28, 90:2–91:1, at 29, 92:14–17. The Court has little doubt that these instances were troubling and uncomfortable to Graham, but there is little in the record that would attribute them to Graham's faith.

For instance, Graham asserts that Barthley and his friends "often tease[d]" Graham and Graham "would see water bottles and nuts and bolts fly towards [his] station and bounce off [his] equipment and nearly hit [him]." ECF 30-3, at 22, 90:16–21. Graham also stated that he saw Barthley and a friend "throw things over [his] head back and forth to each other" when Graham was "in between their stations." *Id.* at 22–23, 90:19–91:1. Though not required to maintain his claim, these acts are the closest thing to "physically threatening" behavior that Graham describes. *See Sunbelt Rentals, Inc.*, 521 F.3d at 318. However, the physical threat presented by "water bottles and nuts and bolts" flung near Graham, while perhaps carrying a potential for physical harm, is simply not of the severity typically envisioned by the applicable standard. *Cf. Miller v. Mediko, Inc.*, No. 5:20-CV-00003, 2021 WL 4026085, at *8 (W.D. Va. Sept. 3, 2021) (observing that statements that plaintiff would be beaten, "end up in the hospital or in the grave," and be hurt "very badly" were those which a reasonable person would perceive as creating an abusive and hostile environment), *reconsidered in part*, No. 5:20-CV-00003, 2022 WL 987190 (W.D. Va. Mar. 31, 2022) (removing such comments from the balance of the circumstances faced by plaintiff because of employer's prompt remedial action to that conduct later presented to the court). Moreover, Graham did not state that he felt physically endangered or threatened by the behavior. *See generally* ECF 30-3, at 22–23.

The single instance of Barthley allegedly attempting to pickpocket Graham does not change the analysis. Graham describes only that such an instance occurred, *see* ECF 30-3, at 24,

92:16–17, and provides no details related to the severity of the interaction, such as how Barthley acted while attempting to pickpocket him or what was said by Barthley, if anything, while attempting to pickpocket him. *Cf. Alers v. City of Philadelphia*, 919 F. Supp. 2d 528, 546 (E.D. Pa. 2013) (holding that an instance of a plaintiff's handgun being stole from his desk, amidst allegations that "co-workers placed his desk on milk crates and glued pennies and a battery to his desk," were "underwhelming, facially neutral incidents" that were not severe or pervasive).

Regarding the conduct Graham was allegedly subject to at the lunch table during his shifts, Graham stated that Barthley and his friends would ask Graham "difficult questions" about his religion, such as "why would God allow suffering?" ECF 30-3, at 48, 198:6–10. After Graham answered, he stated that his coworkers would "get silent and kind of look at each other as if it wasn't the answer they were looking for." *Id.* at 48, 198:11–14. Although Graham stated at his deposition that he now perceives that reaction as a "way of mocking [him]," the Court cannot conclude that a reasonable person would find occasional questions of this kind, followed by a lack of verbal response to the answers given, to be "so out of the ordinary as to meet the severe or pervasive criterion." *Sunbelt Rentals, Inc.*, 521 F.3d at 316. That is especially so in light of Graham's concession at his deposition that "[a]t the time" he did not think the reason his coworkers asked those questions was to make fun of him. ECF 30-3, at 48, 198:17–21.

Graham's discussion with Gray, his second shift supervisor, during which Gray allegedly told Graham that Graham should avoid talking about religion if he wanted to fit in with his coworkers, is likewise uncompelling. Graham does not suggest that Gray disparaged Graham's religion outright during their conversation or demanded that he cease talking about it at work. Rather, according to Graham, Gray "*recommended* that . . . [Graham] should not discuss [his] Bible as people aren't religious nowadays" as a way of fitting in with coworkers. ECF 27-4, at 10,

30

47:13–15 (emphasis added). This Court has held that more egregious statements from supervisors, spanning beyond the context of a single discussion, have failed to meet the "severe or pervasive" standard. *See Kiver*, 2024 WL 3424059, at *2–3, *11–12 (holding that repeated sexual remarks made by the plaintiff's supervisor, while egregious, "failed to clear the high bar required to satisfy the severe or pervasive test" and that "far more extreme conduct has failed to reach the level of humiliation required to establish a hostile work environment" (internal quotation marks and citations omitted) (collecting cases)).

And although Graham has adduced evidence supporting the existence of a "rumor mill" related to Barthley's initial comment to Graham, Graham likewise does not provide evidence regarding "the dates or frequency of such [rumors], or any particular concentration over a limited time frame, sufficient to meet the 'high bar in order to satisfy the severe or pervasive test.'" *See Coleman*, 2021 WL 165130, at *7 (alteration added) (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315). As noted, statements to coworkers that a plaintiff "did not know about do not create a genuine issue of material fact." *Perkins*, 936 F.3d at 210. And although "evidence of how others were treated in the same workplace can be relevant to a hostile work environment claim," the Fourth Circuit has "held that the primary focus in the hostile work environment analysis is on the plaintiff's experience." *Id.* (citation omitted).

The Tenth Circuit's decision in *Throupe v. University of Denver*, although not binding on this Court, offers a helpful example of this concept in application. 988 F.3d 1243 (10th Cir. 2021). There, the Tenth Circuit upheld the district court's determination that none of the conduct identified by Throupe, a male professor who sued his university for harassment based on gender, "[rose] to the level of severity required for a hostile work environment claim." *Id.* at 1255. The court observed that "[w]hile rumors and speculations circulated from 2014 through 2016, Throupe

31

was personally made aware of rumors about his relationship with [a former female student] on only four occasions." *Id.* That conduct, in addition to the investigation carried out against Throupe following the rumors, was "far from the 'steady barrage' of discriminatory conduct necessary to establish pervasiveness." *Id.* (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012)). Here, although Haines stated that the rumor about Graham masturbating while at work was "fairly widespread" and discussed by individuals on several shifts, ECF 30-5, at 20–23, 71:8–74:3, the record suggests that Graham was made aware of the rumor about him only two times—once by Barthley and once by Haines—or three times, to the extent Graham argues that Murray's alleged comments in January of 2022 were related to this rumor.[14] *See* ECF 27-4, at 15, 70:10–17; ECF 30-5, at 21, 72:14–19.

Both parties invoke the Fourth Circuit's decision in *E.E.O.C. v. Sunbelt Rentals, Inc.* as support for their arguments related to Graham's religion-based hostile work environment claim. 521 F.3d 306 (4th Cir. 2008); ECF 30, at 23; ECF 31, at 7. In *Sunbelt Rentals, Inc.*, the Fourth Circuit reversed a district court's grant of summary judgment for the defendant in a case where plaintiff Clinton Ingram, a Muslim American, argued that he was subjected to a religiously hostile work environment in violation of Title VII while working at a construction equipment company. 521 F.3d at 310. In October 2001, "a month after the September 11th attacks," the company hired Ingram as a truck driver, and he was eventually promoted to rental manager. *See id.* At work, Ingram used a "private, upstairs room for short prayer sessions" and attended "a weekly congregational prayer session that took place from 1:00–1:45 p.m. on Friday afternoons." *Id.*

---

[14] However, Graham states in his opposition that "the origin of this rumor is unknown." ECF 30, at 19.

32

Ingram also openly observed tenets of his faith "by keeping a beard and wearing a kufi, a traditional headgear worn by Muslim men." *Id.* at 311.

Ingram produced evidence that he was subject to "a steady stream of demeaning comments and degrading actions directed against him by his coworkers—conduct that went unaddressed and unpunished by Sunbelt supervisors." *Id.* "For instance, coworkers used religiously-charged epithets and often called Ingram names such as 'Taliban' and 'towel head.'" *Id.* Coworkers also "frequently made fun of Ingram's appearance, challenged his allegiance to the United States, suggested he was a terrorist, and made comments associating all Muslims with senseless violence." *Id.* "Additionally, Ingram was the victim of several religiously charged incidents." *Id.* For example, one coworker "held a metal detector to Ingram's head and, after the detector did not go off, called Ingram a 'fake ass Muslim want-to-be turb[an] wearing ass.'" *Id.* (alteration added). In another incident, the same coworker "showed Ingram a stapler and said that 'if anyone upsets you pretend this stapler is a model airplane [and] just toss it in the air, just repeatedly catch it, [and] don't say anything,'" which Ingram understood as a reference to the September 11 attacks. *Id.* A cartoon was also posted in the store's dispatch area "depicting persons 'dressed in Islamic or Muslim attire' as suicide bombers." *Id.*

That was not all. Ingram's timecard "was frequently hidden, especially on Fridays when he went to congregational prayer." *Id.* Coworkers also "constantly unplugged his computer equipment and, on one occasion, defaced his business card by writing 'dumb ass' over his name," among other things. *Id.* "After nearly every incident of harassment, Ingram verbally complained to" his managers. *Id.* Ingram also "expressed his frustration about the ongoing harassment and explained that he believed it was because of his religion" to the company's Human Resources Department. *Id.* "After a short period of relative improvement, the religious harassment and

33

pranks 'just basically started up again.'" *Id.* at 312. "The harassment allegedly continued until Ingram's termination in February 2003." *Id.*

In considering the objective prong of the severe or pervasive standard as applied to Ingram's case, the Fourth Circuit observed that Ingram had produced evidence that he "suffered religious harassment that was 'persistent, demeaning, unrelenting, and widespread.'" *Id.* at 316 (quoting *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 984 (4th Cir. 1997)). Noting the context in which the workplace conduct occurred, the Fourth Circuit observed that "[i]n the time immediately following September 11th, religious tensions ran higher in much of the country, and Muslims were sometimes viewed through the prism of 9/11." *Id.* " Ingram, the lone Muslim employee, was left to bear the verbal brunt of anti-Islamic sentiment." *Id.* Ingram was not subject to name-calling one time—he was called "'Taliban' 'over and over again,' as well as 'towel head.'" *Id.* Ingram was also "persistently harassed about his appearance," and noted that "such 'comments were made often.'" *Id.* Indeed, another employee said to Ingram "that if he ever caught Ingram praying upstairs, that would be 'the end of him.'" *Id.*

Taken together, the instances of harassing conduct that Graham describes fall far below the religiously hostile working environment described in *Sunbelt Rentals, Inc.* Graham admits that he was only called "Bible boy" on one occasion, by Barthley. *See* ECF 27-4, at 28, 91:8–10; ECF 30-3, at 5, 13:12–14.    And although the same individual, Barthley, and his group of friends engaged in troublesome conduct towards Graham over the remainder of his time at Volvo, Graham does not provide evidence of incidents close to the severity or pervasiveness, done "often" or "over and over again," described in *Sunbelt Rentals, Inc.* It is true that in *Sunbelt Rentals, Inc.*, the Fourth Circuit considered as relevant "harassment lacking a direct religious nexus," such as the hiding of Ingram's timecard. 521 F.3d at 317. But as the court observed, "[a]lthough similar pranks were

34

played on other Sunbelt employees, there is evidence suggesting that Ingram suffered such harassment more often than others and more likely because of his religion." *Id.* "For instance, Ingram's timecard was hidden most frequently on Fridays, the day he went to congregational prayer." *Id.* "In light of the extensive, explicitly religious harassment by the same coworkers, a reasonable jury could infer that other harassing incidents were also motivated by a disdain for Ingram's faith." *Id.* at 318. To the contrary, Graham's case lacks evidence of "extensive, explicitly religious harassment" in his former work environment through which to color the conduct he experienced that lacked a direct religious nexus, such as the tossing of nuts and bolts towards his station. *See* ECF 27-4, at 27–28, 90:2–91:1.

While the Court focuses primarily on Graham's personal experience, it notes that "comments made to others" may sometimes be "'relevant to determining whether [Graham] was subjected to' severe or pervasive religious harassment." *See Sunbelt Rentals, Inc.*, 521 F.3d at 317 (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007)). But in *Sunbelt Rentals, Inc.*, the comments made to others matched or neared the severity of the harassing comments Ingram faced. For example, "a Muslim customer of Sunbelt's Gaithersburg office[] testified that Sunbelt employees called him a litany of derogatory names, including 'Bin Laden,' 'Hezbullah,' 'Ayatollah,' 'Kadaffi,' 'Saddam Hussein,' 'terrorist,' and 'sun n[-----].'" *Id.* at 317 (alteration added). Here, although Haines stated that there was a "fairly widespread" rumor "passed around before [Graham] got to second shift" about "taking his Bible into the bathroom at work and masturbating to it," Haines was not able to provide "details as to how that would have started" or "who it came from." ECF 30-5, at 20–21. While certainly troubling, Haines' testimony about a rumor Graham does not testify affected him for months until his interaction with Barthley in June of 2022 is incapable of transforming Volvo's second shift into "an employment atmosphere that

[was] 'permeated with discriminatory intimidation, ridicule, and insult'" for Graham. *Sunbelt Rentals, Inc.*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 21).

"The task [ ] on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion." *Sunbelt Rentals, Inc.*, 521 F.3d at 316. Viewing the inferences drawn from the evidence before the Court in the light most favorable to Graham, the Court has no doubt that several of the incidents described by Graham were offensive and hurtful, and objectively gave "rise to bruised or wounded feelings." *See Perkins*, 936 F.3d at 208. But such incidents, taken together, do not "satisfy the severe or pervasive standard." *Id.* Graham has failed to adduce evidence related to the frequency of the unwelcome conduct he experienced at Volvo, and the conduct described (at least at the level of generality Graham has described it) fails to meet this standard. Moreover, Graham raises no argument and points to no evidence in the record that the comments made, and conduct exhibited by, some of his coworkers actually "affect[ed] the conditions of [his] employment." *Harris*, 510 U.S. at 21. The "ultimate inquiry is whether the conduct is so 'extreme' that it 'amount[s] to a change in the terms and conditions of employment.'" *McIver*, 42 F.4th at 408 (citation omitted). The Court concludes that a reasonable factfinder could not find that the unwelcome conduct at issue in this case related to Graham's religion, viewed as a whole, was severe or pervasive enough to amount to a change in the terms and conditions of Graham's employment. Thus, Volvo is entitled to summary judgment as to Graham's hostile work environment claim on the basis of religion.

### 2.    Disability

The Court reaches the same conclusion with respect to Graham's hostile work environment claim on the basis of disability. Notably, there are far fewer instances of unwelcome conduct Graham invokes with respect to this claim. *See* ECF 30, at 25–26. Graham points first to the

behavior of his coworkers in the first months of his employment, who would allegedly talk down to him and judge him for mistakes he made at his workstation after he told them about his Asperger's syndrome. *See* ECF 27-4, at 37, 102:1–6; ECF 30-3, at 32, 100:11–14. Graham also generally asserts that throughout his employment at Volvo, he felt that coworkers would profile him as "weird" and "creepy" due to his awkward mannerisms and speech tones. *See* ECF 27-4, at 28, 103:11–16. Others, including Haines, observed Graham's difficulties with coworkers as well. *See, e.g.*, ECF 30-5, at 15 ("[Graham] seemed to have trouble with almost everybody that he talked to in terms of being accepted and people really wanting to be social with him . . . ."). The Court has little doubt that these episodes were uncomfortable for Graham. However, none of the instances described rise to the level of severe or pervasive.

As an initial matter, Graham's general assertions about being profiled as "weird" or "creepy" and being subject to heightened criticism for job performance and mistakes following this incident are too vague and do not rise to the level of severity necessary to survive summary judgment. *Cf. Dangerfield,* 2019 WL 6130947, at *3 (quoting *Harris,* 510 U.S. at 21) ("Plaintiff fails to provide any of the substance behind the 'condescending and abusive language' she says she experienced, making it impossible for the Court to determine whether such behavior was racially motivated."); *Lucas v. Intercept Youth Servs., Inc.,* No. 3:23CV19 (RCY), 2023 WL 3437812, at *4 (E.D. Va. May 12, 2023) ("The Complaint's allegations of negative feedback from supervisors and conflict with coworkers over profanity, gossip, and negative comments about team performance are just the type of rude treatment, callous behavior, and routine difference of opinion that do not constitute severe or pervasive harassment."). Rather, these general assertions describe a situation in which Graham "was disliked by a specific group of [his] co-workers who behaved in an immature and unprofessional manner to [him]." *See Noveras v. Bon Secours Hosp.,* Civ. No.

HAR 94-3319, 1995 WL 656900, at *5 (D. Md. Oct. 27, 1995), *aff'd*, 81 F.3d 150 (4th Cir. 1996). Although "certainly an unpleasant experience for" Graham, "it is not enough to establish a hostile work environment." *Id.*

Graham describes one specific incident where a misunderstanding between himself and his coworker, Henline, allegedly culminated in Henline slamming "her hand down on the table" and making threats towards him before leaving the area. ECF 27-4, at 17, 78:17–18, at 18, 79:1–5, 79:9–19. During the interaction, Graham stated that he conveyed to Henline his misunderstanding was because of his Asperger's. *See id.* at 17, 78:15–16, at 18, 79:5–8; *see also id.* at 24, 97:11–18. Afterwards, Graham noted that Henline "continuously insisted that [Graham] needed to do better" and took a "tone" with him, despite Graham's explanation that he was doing the best he could on account of his disability. *Id.* at 37, 102:1–6; ECF 30-3, at 33, 101:12–19. However, "[e]valuation and criticism of one's work performance, while perhaps unpleasant, is not abusive." *Holloway v. Maryland*, 32 F.4th 293, 301 (4th Cir. 2022). Indeed, the Fourth Circuit has before rejected a plaintiff's "contention that one episode of yelling and pounding the table, even considered with his other allegations, is sufficiently severe or pervasive to establish an abusive environment." *Id.* (citing *Buchhagen v. ICF Int'l, Inc.*, 545 Fed. App. 217, 219 (4th Cir. 2013)). Accordingly, the Court agrees that Volvo is entitled to summary judgment on Graham's MFEPA hostile work environment claim brought on the basis of his disability.

## IV.    CONCLUSION

In sum, Graham has failed to point to evidence that his "workplace [was] permeated with discriminatory animus and ridicule based" on his religion and disability. *Thomasson, v. Ascellon, Corp.*, Civ. No. 24-1478-PX, 2026 WL 691640, at *6 (D. Md. Mar. 11, 2026) (alteration added). Thus, for the foregoing reasons, Volvo's motion for summary judgment is granted. The Clerk will be directed to enter judgment in favor of Volvo and close the case.

A separate implementing order will issue.

Dated: <u>March 20, 2026</u>                                    <u>          /s/          </u>
                                                                Brendan A. Hurson
                                                                United States District Judge